hYELVERTON, Judge.
This appeal was brought by Forby Contracting, Inc. (Forby) and its insurer, Wau-sau Insurance Company (Wausau), from a judgment finding Forby to be the sole negligent actor in causing a vehicular accident that resulted in the death of James Simmons and in an award of damages to his survivors. Pending appeal, all issues except one were settled. The only remaining issue to be decided by this courtjjis whether the trial court correctly found that the State of Louisiana, Through the Department of Transportation and Development (DOTD) was entitled to contractual indemnity from Forby.
The trial was lengthy and complicated, and the trial judge gave detailed written reasons for judgment. Judge Godwin’s clear and well articulated opinion is. supported by the evidence in the record. Because it is so sound and well reasoned, we will quote his opinion where relevant to the issue on appeal. Also, because we find no manifest error, we affirm the trial court’s judgment. See Rosell v. ESCO, 549 So.2d 840 (La.1989).

OPINION

Forby was found negligent in causing James Simmons’ death. Forby was making some repairs to approximately 10.5 miles of Interstate 10 from its intersection with U.S. Highway 171, in Calcasieu Parish, east to the Jefferson Davis Parish line. At the time' of the accident, Forby was repairing the westbound inside lane. Relevant to the issue on appeal is the contract between Forby and the DOTD, under which Forby was making the repairs, and subsequent modifications made to that contract. We quote from Judge God-win’s opinion:
The subject portion of Interstate 10 has two concrete travel lanes wqst-bound, [sic] and two concrete travel lanes east-bound, [sic] all 12 feet wide, with 10-foot wide paved shoulders contiguous with the outside travel lanes, and _4 foot wide paved shoulders contiguous with the inside travel lanes_
The contract work called for replacing designated sections of the inside and out *616 side travel lanes on both sidesJjof the roadway. The term “roadway” generally includes the travel lanes on both sides, and the shoulders.
Prior to October 31, Forby had completed the patching of the outside lanes on both sides of the roadway, and was in the process of replacing or patching the designated sections of the inside lane on the west-bound [sic] sidé. Patching in the inside lane necessarily required closing the inside lane to traffic. The contract contained the following provision regarding maintenance of traffic ...:
“MAINTENANCE OF TRAFFIC: Subsection 104.03 of the Standard Specifications is amended to include the following requirements:
“The contractor shall provide for and maintain through and local traffic at all times and shall conduct his operations in such manner as to cause the least possible interference with traffic in the vicinity of this project.
“The contractor shall direct special attention to the maintenance of traffic at entrance and exit ramps particularly when construction operations are being conducted 'on the adjacent travel lanes. Additional signs, barricades, channelizing devices etc. shall be provided and maintained by the contractor as directed by the engineer and their cost shall be included in the price bid on Item 713(1), Temporary Signs and Barricades.
“The contractor shall conduct his operations on 1 side of the roadway at a time. The roadway and shoulders shall remain open to traffic as much as possible during non work periods as directed by the engineer.”
Additionally, the contract included a schematic ... which ... will be hereafter referred to as the Contract Traffic Control Plan. The Contract Traffic Control Plan calls for certain signs and channeling devices to warn approaching traffic that the left lane is closed, and that speed is reduced to 45 miles per hour, with channeling devices denoting that the traffic is reduced to one outside lane in order to safely drive by the work area.
Observance of the Contract Traffic Control Plan required cement trucks to position on the inside shoulder in order to deliver concrete for the patch. The inside shoulder Rbeing only 4 feet wide, required the concrete trucks to locate partially on the grassy portion of the inside slope. It became apparent that due to the slope, with the aggravating factor of soft ground, the top-heavy concrete trucks were in danger of tipping over. At one point, chains were used to restrain them.
Because of this risk to the concrete trucks, Forby first deviated from the Contract Traffic Control Plan by placing the concrete truck in the ohtside lane, and using a flag person ahead of the concrete truck toward the on-coming traffic to slow the traffic and direct it around the truck. This solution immediately posed another problem in that using a flag person resulted in traffic coming almost to a stop, and backing up past the initial sign a mile away denoting the beginning of the construction zone. Also, there were instances when traffic passed the flag person and then came back into the outside lane between the flag person and the truck.
Due to the foregoing problems, discussion ensued between Forby and DOTD through Forby’s president, Richard Brandt, the corporate officer overseeing this work, and Pat Landry, DOTD’s project engineer, as to some modification of the Contract Traffic Control Plan which would not require the concrete trucks to locate on the inside shoulder while pouring. The testimony of Pat Landry and Richard Brandt is in substantial agreement sufficient to satisfy this court by a preponderance of the evidence, that an oral authorization was granted by DOTD, through Pat Landry, to modify the Contract Traffic Control Plan under limited circumstances, which are hereafter referred to as the Modified Traffic Control Plan.
The purpose of the modified plan was to permit shifting of the outside lane to the right with the use of a second taper while continuing to provide a 12-foot travel lane comprising the outside 2 feet of the concrete travel lane and the 10 feet width of *617 the adjacent, paved shoulder, -with the following conditions:-
1) The asphalt shoulder was only to be used when necessary for concrete trucks to occupy the right lane for pouring of concrete;
|s2) At least a 12-foot wide travel lane was to be provided, consisting of the asphalt shoulder of 10 feet, and at least 2 feet of the outside lane;
3) The asphalt should must [sic] be in good condition, without potholes or any structural problems. If problems were found, Forby’s [sic] was to correct them; and
4) A flag person was to be stationed ahead of the second taper toward oncoming traffic.
The effective date of the Modified Traffic Control Plan was not established in the testimony, but circumstantially, it could have been the day before the accident or up to a few days before the accident, with it being more likely to be closer to one day than a few days.
The trial judge then described the “accident and attendant circumstances,” in pertinent part, as follows:
Before Simmons entered the construction zone on October 31,1990, the Modified Traffic Control Plan was in place. It is undisputed that there was no flag person, and the shifted right lane had been reduced to less than the required 12 feet of travel lane by the channeling of traffic entirely onto the shoulder through the use of the orange and white barrels seen in many of the photographs in evidence. The barrels marking the south edge of the shifted lane were placed either entirely on the travel portion of the outside lane but up to its edge as defendants contend, or intruded into the shoulder itself.
After describing the testimony of three witnesses to the accident, Judge Godwin continued:
The testimony of these three witnesses is both credible and reliable as a whole, notwithstanding assertions in brief by For-by to the contrary. From this testimony, this court finds that the barrels intruded on the shoulder at least one and one-half feet.
|6The trial judge then described the accident as reported by the eyewitnesses. Mr. Simmons was driving an 18-wheeler. He was driving in a professional and safe manner. When he entered the second taper (onto the shoulder) his right wheels were on the grass. The truck began turning at about a 45 degree angle to the right, slid down the embankment, and turned over onto its right side. Mr. Simmons was partially ejected from the cab, and he was pinned underneath it. His death was caused by traumatic asphyxiation.
The trial judge then discussed the testimony of experts who inspected the accident scene and other relevant evidence, and in his cause-in-fact analysis he concluded:
Based on the foregoing specifics and on consideration of all the evidence of circumstances surrounding the accident, the court finds that the evidence preponderates substantially that the cause in fact of this accident was Simmons being required to drive without warning on an unreasonably dangerous, narrow travel lane at 45 miles per hour, forcing his right rear wheels on to the grassy slope, shifting the center of gravity of the truck and tipping it to the right, and starting it on its course to its upset.
As to whether the decision to modify the plan was a cause in fact of the accident, the trial judge concluded that:
DOTD acted properly to meet the exigent circumstances of the risk to the concrete trucks tipping on the inside slope by providing an alternate but safe traffic control plan, which could be considered comparable to the “typical” minimum provided for in the contract. *.
The expert testimony as a whole, plaintiffs’ and defendants’, support the conclusion that the Modified Traffic Control Plan provided a reasonably safe alternative for the continuance of traffic in the west bound lane during the pouring of concrete. Thé problem, as previously noted, is that the Modified Traffic Control Plan was not followed.
*618 ^Although the decision by the DOTD modifying the traffic control plan was not negligent, the DOTD’s duty to maintain the highways and their shoulders in a reasonably safe condition is a nondelegable duty, and the trial judge correctly held that the “DOTD is liable in solido with Forby for [the plaintiffs’ damages], subject to the limitations of R.S. 13:5106.” See Deville v. Budd Const Co., 617 So.2d 570 (La.App. 3 Cir.1993). However, the DOTD’s contract with Forby provided indemnity to DOTD in the case of damages resulting from Forby’s negligence. Thus, the trial court held that the DOTD was entitled to full indemnity from Forby for all amounts owed by the DOTD to the plaintiffs. Forby argues that the court erred in making that judgment based on a manifestly erroneous finding that the DOTD’s fault was passive. Because we find no clear error in that factual finding) we disagree with Forby.
As already stated, the DOTD cannot contract away its duty to maintain the highways and shoulders in a reasonably safe condition. But there is nothing that prevents DOTD from insuring itself against such liability, whether it does so through liability insurance, contractual indemnity clauses in its construction and repair contracts, or otherwise. In Roberts v. State, Through DOTD, 576 So.2d 85 (La.App. 2 Cir.), writ denied, 581 So.2d 685 (La.1991), the court held that where the DOTD’s liability is based strictly on the negligence of the contractor (i.e., the DOTD has committed no act of negligence itself but is strictly liable due to its nondele-gable duty), the DOTD could rely on a contractual indemnity clause to obtain indemnity from the contractor. See also Robinson v. State Through Dept. of Transp., 454 So.2d 257 (La.App. 1 Cir.), writ denied, 458 So.2d 122 (La.1984). We agree with that holding.
_Jj¡Forby’s main arguments on appeal are: 1) The DOTD was responsible for supervising the area and was negligent in its supervision; and 2) The trial court’s finding that the DOTD required a flag person in its modification of the contract with Forby was erroneous, and because the court found that lack of a flag person was a cause in fact of the accident, the DOTD was liable for failing to require a flag person. We find no merit to Forby s argument that DOTD failed in its supervision of the area, and the trial court’s finding in that respect was not manifestly erroneous.
We also find no manifest error in the trial court’s determination that a flag person was required and that Forby deviated from the modified, contract by not having one. However, even if we accept for the sake of argument that the trial court was wrong in its finding that the modified plan required a flag person, we would still affirm the court’s judgment. Our view of the evidence and expert testimony is that the sole cause of the accident was the placement of the barrels. This accident most likely would have happened even had a flag person been in place. Thus, Forby deviated from the terms of the modified agreement by placing the barrels on the shoulder and not leaving enough travel space, not by failing to station a flag person at the start of the taper. That being so, the DOTD is entitled to indemnity.
Because we find no manifest error in the trial court’s factual finding that the DOTD was not negligent but only hable due to its nondelegable duty, we hold that the DOTD is entitled to indemnity from Forby for the damages it owes to the plaintiffs. All costs of this appeal are assessed to Forby and its insurer, Wausau.
AFFIRMED.